**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION**

**TUNICA WEB ADVERTISING, INC. AND
CHERRY L. GRAZIOSI,**                                                     **PLAINTIFFS,**

**VS.**                                          **CIVIL ACTION NO. 2:03CV234-P-D**

**BARDEN MISSISSIPPI GAMING, LLC (d/b/a
"Fitzgerald's Casino and Hotel"); BL DEVELOPMENT
CORP. (d/b/a "Grand Casino Tunica"); ROBINSON
PROPERTY GROUP, LTD PARTNERSHIP (d/b/a
"Horseshoe Casino & Hotel"); TUNICA PARTNERS
II LP (d/b/a "Harrah's Tunica Mardis Gras Casino");
BALLY'S OLYMPIA LIMITED PARTNERSHIP
(d/b/a "Bally's Saloon & Gambling Hall"); HWCC-
TUNICA, INC. (d/b/a "Hollywood Casino Tunica");
BOYD TUNICA, INC. (d/b/a "Sam's Town Hotel &
Gambling"); and SHERATON TUNICA
CORPORATION (d/b/a"Sheraton Casino & Hotel"),**               **DEFENDANTS.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the court upon The Casino Defendants' Motion for Summary

Judgment [299-1]. Upon due consideration of the motion and the responses filed thereto, the court

is prepared to rule.

## I. FACTUAL BACKGROUND

<u>A. Facts</u>

Tunica County, Mississippi is the third largest venue for casinos in the United States – the

first being Las Vegas, Nevada, the second being Atlantic City, New Jersey.

In November 1999, Cherry Graziosi acquired ownership, in her own name, of the internet

domain names "tunicamiss.com" and "tunicamississippi.com" for approximately $140.00 from

Network Solutions, Inc., a domain name registrar. In December 1999, one month after she purchased the aforementioned domain names, Graziosi entered a one-year contract with Circus Circus Mississippi, Inc. d/b/a Gold Strike Casino Resort wherein Gold Strike agreed to lease the two domain names for $2000.00 per month. Anyone who typed tunicamiss.com or tunicamississippi.com in their internet browser address bar was automatically redirected to goldstrikemississippi.com. When the one-year period ended, Graziosi and Gold Strike renegotiated their contract and Gold Strike continued to lease tunicamiss.com and tunicamississippi.com on an exclusive month-to-month basis for two years at $5000.00 per month.

Graziosi formed Tunica Web Advertising, Inc. ("TWA"), a Maryland corporation, in August 2000. Graziosi is the sole shareholder and CEO of TWA. In October 2000, TWA purchased the domain name "tunica.com" for around $20,000 from a Canadian corporation. In November 2000, TWA leased tunica.com on an exclusive basis with Gold Strike for 90 days at $3000.00 per month. Gold Strike continued to lease tunica.com on a month-to-month basis for another three months until April 30, 2001. Throughout this period, there was no actual website operated at tunica.com. As with tunicamiss.com and tunicamississippi.com, when one typed tunica.com in the internet browser address bar, one would be forwarded to Gold Strike's website.

The Tunica County Tourism Commission, a local governmental entity which promotes and markets Tunica as a travel destination and is funded by hotel and restaurant taxes levied in Tunica County, sued Graziosi claiming that she was a cybersquatter and had no legal right to own tunicamiss.com or tunicamississippi.com. As part of the settlement of the lawsuit, Graziosi agreed to transfer all of her rights to the two domain names to the Tourism Commission. As part of that agreement, the Tourism Commission agreed to "release all claims or rights of any kind or nature in

the ownership use, control of use, marketing, sale, or any other lawful use of the domain name tunica.com."

On May 14, 2001, TWA appeared before the Tourism Commission. TWA, through Graziosi, proposed that if the casinos paid TWA $2500.00 per month per casino (a total of $300,000.00 per year), anyone who typed in the internet address "tunica.com" would be redirected to the Tourism Commission's website – a pre-existing website that already featured, *inter alia*, information about all of the nine major casinos in Tunica County.

Immediately after the May 14, 2001 meeting at the Tourism Commission, Graziosi wrote a letter to Karen Sock, the General Manager of the Grand Casino and a member of the Tourism Commission, attached to which was the following proposal:

PROPOSAL

WWW.TUNICA.COM

- $2500 per casino per month (no increase in fee for a multi-year contract).

- Direct name to Tunica Tourism's website. Tunica Web Advertising, Inc. would have access to statistics for www.tunica.com.

- All casinos in Tunica would have a collective right of first refusal to purchase the name.

Karen Sock referred the matter to the Tunica Casino Operators Association – a trade association formed by the local area casinos,  the president of which was Karen Sock – and called an "emergency TCOA meeting" to be held on May 30, 2001 to discuss TWA's proposal. At the meeting, Webster Franklin, the Executive Director of the Tourism Commission, discussed the current plans of the Tourism Commission's website. Clyde Callicott, then Marketing Director for Gold Strike, discussed Gold Strike's prior experience with leasing tunica.com.

At the May 30, 2001 meeting of the TCOA trade association, none of the casinos chose to accept TWA's proposal to lease tunica.com for $2500 per month per casino in order to have tunica.com redirect an internet browser to the Tourism Commission's website which already featured information about the casinos.

A secretary at the TCOA meeting, Patsy Brown, wrote in her notes (the plaintiff argues these are minutes) that "[t]he purpose of this meeting was to discuss the website tunica.com" and ultimately that "[t]he consensus of the group attending was to discuss to not utilize the site." According to Graziosi, Clyde Callicott told her that Dominic Mezzetta (GM of Fitzgerald's) said to the group "that there's no use for us to be involved as properties separately on this" and that "dealing with tunica.com was not the right thing to do."[1]

A week after the May 30, 2001 meeting, Graziosi emailed Clyde Callicott on the outcome of the meeting whereupon Callicott emailed the following email response:

Cherry,

I was informed by my VP/GM (based on that discussion held at the TCOA meeting) to terminate the business relationship we have created with the "tunica.com" site. I wish I could do more but my hands have been officially tied by the TCOA on this issue.

I'm sorry,

Clyde.

Graziosi also says that Callicott told her that Robert McQueen (GM at Horseshoe Casino) said "I am not interested in doing business with her. Let's all agree not to do business with her. And that way

---

[1] The defendants argue this is inadmissible hearsay.

the site would be worthless."[2] Graziosi also says that Callicott told her that a "gentlemen's agreement" was made not to use tunica.com. Weeks after the May 30 meeting, Graziosi states that she advised Ellen Duffin, a marketing executive at Grand Casino, that Graziosi was aware of the "gentlemen's agreement" to which Duffin responded "I guess the feeling is, if nobody does business with you, your site will be worthless."[3]

After the May 30, 2001 meeting, TWA changed its business model. Instead of concentrating on leasing the domain address tunica.com to be redirected to other sites, TWA hired a web developer to create an actual website for tunica.com. Since July 6, 2001, TWA has operated a website on tunica.com. The website produces income for TWA through advertising or commissions from online bookings for hotels located in Tunica County. Once tunica.com the website became operational, TWA made different proposals to some, but not all, of the casinos about placing advertising on tunica.com.[4] Gold Strike entered into a contract in October 2001 with TWA wherein they agreed that TWA was granted the exclusive right to book bus tours with specified terms with Gold Strike on a commission basis. After the contract became effective, TWA issued a press release in November 2001 published on tunica.com's website stating that "Tunica.com and Gold Strike Casino Resort are working together to provide accommodations to organized bus tours via Tunica.com." It is undisputed that TWA never sent Gold Strike a single bus tour referral.

In response to TWA's separate proposals to advertise on tunica.com's new website, the

---

[2] The casino defendants argue that this statement is inadmissible hearsay upon hearsay.

[3] The casino defendants argue that this statement is inadmissible hearsay.

[4] Little, if anything, has been mentioned by any of the parties regarding the specifics of the separate post-May 30, 2001 proposals regarding tunica.com's actual website.

remaining casinos declined individually to do any business with tunica.com.

In August or September 2002, TWA entered discussions with Clyde Callicott, who had left Gold Strike to become Marketing Director at Grand Casino, and Memphis radio personality Rudi Schiffer about forming a new company that would market tunica.com. Their plan was to develop tunica.com into an additional marketing medium for the casinos. Their discussions called for Rudi Schiffer to "acquire" tunica.com and serve as the front man for the company in dealing with the Tunica community and the casinos. TWA would be a silent partner, retaining 10% interest in any profits from the sale of advertising on the tunica.com. Clyde Callicott would also be a silent partner and serve as an insider within the Tunica gaming community.

It is undisputed that the casinos had no knowledge of either TWA's or Callicott's involvement in the project.

Callicott developed a business plan for tunica.com which he sent to TWA and Schiffer. Using this business plan, Schiffer went to the casinos and attempted to sell advertising on tunica.com. Both Graziosi and Callicott testified that Schiffer was uncomfortable with the technology and understood virtually nothing about websites. Meanwhile, TWA tried to sell "half" of tunica.com in October 2002 to an offshore, on-line casino known as "Casino on Net." This sale never happened, and Schiffer's marketing efforts related to tunica.com continued with the casinos.

None of the casinos chose to advertise on the "all new Tunica.com" website. On November 19, 2002, Callicott, then Marketing Director at the Sheraton and Bally's, emailed Graziosi which contained the following[5]:

---

[5] The casino defendants argue that this email is inadmissible hearsay because Callicott was not acting in his official capacity when writing the email and therefore none of the hearsay exceptions apply.

The meeting went well ... however it's [sic] looks like the Tunica casino (the TCOA) is turning their backs on Rudi thanks to a special meeting held last week backed by Dominic from Fitzgeralds. They apparently held a meeting last Tuesday to discuss this ... in a similar fashion as they did when you where [sic] involved. They voted to stray [sic] away from the site so it could evently [sic] be sold and bought at a later date by them.

Dominic asked for a majority vote from each property to see if they would ban advertising on this site ... his arguement [sic] is that (although valuable) it is not for one individual to profit from. He beleaves [sic] that the state should own the site. With such a strong opponnent [sic], no property will cross that line individual [sic] to advertise with this project.

Rudi Schiffer emailed TWA on November 28, 2002 and reported:

Cherry,

have not made any headway with sales efforts .... seemed we missed the budget cycle by casinos and nobody wants to spend on another site and they seem to be pretty satisfied with their own websites. that ends my effort and sorry we couldn't get it together, I think it had great promise but I couldn't convince the folks who had the budgets to expand them for tunica.com

**B. Procedural History**

Graziosi and TWA filed their original Complaint on filed June 27, 2003 asserting the following claims: (1) conspiracy in restraint of trade in violation of the Sherman Antitrust Act, Section One against all nine casinos as well as the Tunica Casino Operators Association and the Tunica County Tourism Commission; (2) conspiracy in restraint of trade in violation of the Mississippi Antitrust Act; (3) intentional interference with business relations against the casino defendants; (4) intentional interference with contractual relations against the casino defendants; and (5) breach of contract against the Tourism Commission only.

About five months later on November 22, 2004, the court entered a Memorandum Opinion and Order granting the defendants' immunity-based summary judgment motion insofar as Counts

1 through 4 were dismissed with prejudice as to the Tourism Commission based on the governmental immunity to antitrust actions provided by the Local Government Antitrust Act, 15 U.S.C. § 35(a).

On February 11, 2005, the plaintiffs filed their Amended Complaint wherein the two antitrust claims are reasserted against the casinos only,[6] the intentional interference with a business relations is reasserted against the casinos (while the intentional interference with contractual relations was dropped), and the breach of contract claim was reasserted against the Tourism Commission.

The casinos, all except Hollywood, filed counterclaims against the plaintiffs arguing unfair trade practices, unjust enrichment, breach of contract with regard to attorney fees, and trademark infringement for tunica.com's use of the casinos' trademarked names.

With regard to their antitrust claims, the plaintiffs argue that the casinos' behavior constitutes a horizontal boycott and is therefore a *per se* unreasonable restraint of trade entitling the plaintiffs to treble damages.

The casino defendants filed the instant motion for summary judgment. The Tourism Commission also filed a separate motion for summary judgment with regard to the breach of contract claim which the court has recently granted, thereby taking the Tourism Commission out of this case. Furthermore, the plaintiffs settled their claims against Circus Circus Mississippi, Inc. (Gold Strike); thus, the plaintiffs' claims against Gold Strike were dismissed with prejudice on December 5, 2005.

What is more, in the instant motion for summary judgment the defendants argue that Cherry Graziosi has no standing to sue individually in this case because tunica.com is owned by Tunica Web Advertising, Inc. and not Graziosi, who is the sole shareholder and CEO of TWA. Graziosi concedes

---

[6] Originally, the antitrust claims were also asserted against the Tunica Casino Operators Association; however, pursuant to an agreed order entered on November 28, 2005, the plaintiffs' claims against TCOA were dismissed with prejudice.

in her response to the defendants' motion for summary judgment that she has no individual standing to sue the casino defendants with regard to their alleged efforts to boycott tunica.com.

Therefore, what remains is: (1) TWA's federal and state antitrust claims (which are analytically identical) and intentional interference with business relations claim against eight of the nine casinos originally sued; and (2) the casinos' (all except Hollywood and Gold Strike) counterclaims.

## C. Summary Judgment Arguments

The casinos argue *inter alia* that the plaintiff's claims against them must fail as a matter of law because: (1) there was no horizontal boycott, therefore the *per se* unreasonable test for violation of the Sherman Antitrust Act Section One does not apply; (2) the rule of reason test should be used to determine whether the casinos unlawfully conspired to unreasonably restrain trade when they decided, individually, not to use tunica.com; (3) the rule of reason test will show that there was no unlawful conspiracy and that none of the casinos' behavior unreasonably restrained trade; (4) TWA's proposal to the casinos via the Tourism Commission was a joint proposal and so, under the *Copperweld* doctrine, any joint refusal by the casinos were the acts of a single actor thereby avoiding liability under Section One; (5) the casinos had many individual reasons not to do business with tunica.com, including: (a) the belief that merely having the address tunica.com redirect to the Tourism Commission website was not worth $2500 per month per casino (which would be $300,000 per year); (b) the casinos already had their own websites; (c) the Tourism Commission already had a website which featured the casinos; (d) the quality of the website made well after the joint proposal to lease the mere address tunica.com was sorely inferior to the websites already used by the casinos and the Tourism Commission; (e) one or more of the casinos did not want to do business with a

9

cybersquatter; and (f) the information on the tunica.com website made after the initial proposal for mere leasing of tunica.com was simply copied from the casinos' and the Tourism Commission's websites; (6) the evidence that plaintiff proffers as circumstantial or direct evidence of a conspiracy is all inadmissible hearsay; and (7) the plaintiff has not established the elements of intentional interference with business relations.

The plaintiff responds *inter alia* that the behavior of the casinos, as evidenced by the emails received by Graziosi and statements that she heard from others, constituted a horizontal boycott which has been ruled a *per se* unreasonable restraint of trade violative of Section One of the Sherman Antitrust Act. Therefore, TWA argues it is entitled to treble damages of the lost profits tunica.com would have made had the casinos not boycotted it, which it estimates as approximately $300,000 times three. TWA argues alternatively that if the court does not rule that there was a horizontal boycott, thereby requiring the rule of reason test to determine whether there was an unreasonable restraint of trade, the evidence shows that the casinos' behavior had an anticompetitive effect on the relevant market which TWA argues is online advertising in Tunica County, Mississippi (whereas, the defendants argue that the relevant market is advertising in general – including internet and traditional advertising methods – in Tunica County).

## II. DISCUSSION

### A. Summary Judgment

Summary judgment should be entered only if "[t]here is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment has the initial burden of demonstrating through the evidentiary materials that there is no actual dispute as to any material fact in the case. *Celotex Corp. v. Catrett*,

477 U.S. 3l7, 323 (l986). On motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (l986). In determining whether this burden has been met, the court should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion. *Id*. Furthermore, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, *supra*, at 322.

The summary judgment procedure does not authorize trial by affidavit. Rather, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, *supra*, at 255. Accordingly, a court may not decide any factual issues found in the record on motion for summary judgment, but if such material issues are present, the court must deny the motion and proceed to trial. *Impossible Elec. Tech. v. Wackenhut Protection Systems*, 669 F.2d l026, l03l (5th Cir. l982); *Environmental Defense Fund v. Marsh*, 65l F.2d 983, 99l (5th Cir. l98l); *Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.*, 420 F.2d l2ll, l2l3 (5th Cir. l969).

Under the provisions of Federal Rule of Civil Procedure 56(e), a party against whom a motion for summary judgment is made may not merely rest upon his pleadings, but must, by affidavit, or other materials as provided in Rule 56, inform the court of specific facts showing that

there is a genuine issue for trial. *Celotex Corp. v. Catrett*, *supra*, at 324.

Summary judgment is not proper if a dispute about a material fact is "genuine," or in other words the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, *supra* at 248. There is no such issue unless the evidence sufficiently supports the non-moving party's version of the facts for a jury to return a verdict in the non-moving party's favor. *Id.*, at 249. The relevant inquiry is whether or not there is sufficient disagreement on the facts to submit them to the jury or whether it is so one-sided that one party should prevail as a matter of law. *Id.*, at 251. The issue must be genuine, and not pretended, and the evidence relied on to create such an issue must be substantial. *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824, 826 (5th Cir. 1978).

1. Summary Judgment Standards in Antitrust Cases

The Supreme Court in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464 (1962) held that in antitrust cases, summary procedures should be used sparingly. However, in *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) the Court appears to have relaxed that standard. The court wrote in *Matsushita* that "to survive petitioners' motion for summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury." *Id.* at 585-586. Furthermore, the Court in *Eastman Kodak v. Image Technical Services*, 504 U.S. 451 (1992) maintained *Matsushita*'s position that "[i]f the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." Furthermore, "there must be evidence that tends to exclude the possibility of independent action by the [defendants]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve

an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

## B. Sherman Antitrust Act Section One Standards

Section One of the Sherman Antitrust Act provides that "Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or foreign nations is declared to be illegal." 15 U.S.C. § 1

The Sherman Antitrust Act's basic idea is that unrestricted competition will result in the most favorable allocation of economic resources and the lowest prices for a variety of goods and services. *Nat'l Society of Prof. Engineers v. United States*, 435 U.S. 679 (1978). In other words, the antitrust laws are designed to discourage anticompetitive behavior thereby encouraging capitalism.

An important fact is that the antitrust laws are intended to protect competition not individual competitors. *Corgill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986); *U.S. v. Amer. Airlines, Inc.*, 743 F.2d 1114 (5th Cir. 1984), *cert. denied* 106 S.Ct. 420 (1985). The fact that a company may have to withdraw from the market because of intense competition will not, without more, raise any problems under the antitrust laws. *Copperweld Corp. v. Independence Tube Corp.*, 468 U.S. 85 (1984).

To prove a claim under Section One of the Sherman Act, a plaintiff must prove: "that the defendant (1) engaged in a conspiracy; (2) that [unreasonably] restrained trade; (3) in a particular market." *Spectator's Communication Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001). "To prove conspiracy or 'concerted action,' the plaintiff must prove that the conspirators had a 'conscious commitment to a common scheme designed to achieve an unlawful objective." *Id*. (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)).

In determining whether the defendants violated the antitrust laws by unreasonably restraining trade, the court will use the rule of reason, "weighing all circumstances of the case ... unless the combination falls within one of the categories of *per se* unreasonableness – conduct so pernicious and devoid of redeeming virtue that is condemned without inquiry into the effect on the market in the particular case at hand." *Spectator's*, 253 F.3d at 223.

## 1. Per Se Unreasonable Restraint of Trade

One example of a combination or conspiracy that is considered a *per se* unreasonable restraint of trade is a group or horizontal boycott. Group boycotts are "joint efforts by a firm or firms to disadvantage *competitors* by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Northwest Wholesale Stationers v. Pacific Stationery and Printing Company*, 472 U.S. 284, 294 (1985) (emphasis added). "Some group boycotts fall into the category of *per se* section 1 violations, but not all. 'Exactly what types of activity fall within the forbidden category is ... far from certain. "[T]here is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine."'" *Spectator's,* 253 F.3d at 223 (citations omitted).

"Although the distinction between boycotts that are *per se* illegal and those judged by the rule of reason is often a vexing one, one rule is clear: only horizontal boycotts can be *per se* violations of the Sherman Act." *Id*. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints ...." *Business Elecs. Corp. v. Charp Elecs. Corp.*, 485 U.S. 717, 730 (1988). "The decision to apply the *per se* rule turns on whether the practice facially appears

to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to increase economic efficiency and render markets more, rather than less, competitive." *Consolidated Metal Products, Inc. v. American Petroleum Institute*, 846 F.2d 284, 290 (5th Cir. 1988) (citations omitted).

The defendants argue that their alleged behavior cannot be considered a horizontal boycott simply because they are not competitors of TWA – *i.e.*, the defendants are casinos whereas the plaintiff at the time of the joint proposal was merely a company that owned a domain name and who later became a company owning and operating a website. The plaintiff responds that "[t]o make a *per se* case, the horizontal agreement need not be between competitors of the victim." *Spectator's*, 253 F.3d at 223. However, that is not the end of the statement made by the Fifth Circuit in *SPectator's*. The Fifth Circuit continued:

> In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 29 S.Ct. 705, 3 L.Ed. 741 (1959), a boycott arranged by a single competitor of the victim retailer, but carried out by a 'wide combination' consisting of manufacturers and distributors, as well as the competing retailer, led to *per se* liability. .. *NYNEX* [*Corp v. Discon, Inc.*, 525 U.S. 128 (1998)] harmonized *Klor's* with its rule limiting *per se* analysis to horizontal boycotts: 'Although *Klor's* involved a threat made by a *single* powerful firm, it also involved a horizontal agreement among those threatened, namely, the appliance suppliers, to hurt a competitor of the retailer who made the threat.'"

*Spectator's*, 253 F.3d at 223. This paragraph illustrates that although a horizontal boycott may not require an unlawful agreement among a group who are all competitors of the victim, at least one competitor of the victim must partake in the agreement for the boycott to be horizontal – hence the word "horizontal," since to be horizontal means to be on the same level of competition as the victim.

The court concludes that the defendants' alleged behavior cannot be a horizontal boycott because no one who made the alleged agreement to not do business with tunica.com was a

competitor of the plaintiff. Rather, the casinos were simply prospective customers of the plaintiff, nothing more. Therefore, the court cannot rule that the casinos' alleged behavior was a *per se* unreasonable restraint of trade. Hence, the court must turn to the rule of reason analysis.

## 2. Rule of Reason Analysis

"'To prove an antitrust violation under the rule of reason ... [a plaintiff] must show the defendant's conduct adversely affected competition.' That is, the rule of reason requires plaintiffs to show that the defendants' actions amounted to a conspiracy against the market – a concerted attempt to reduce the output and drive up prices or otherwise reduce customer welfare. Under the rule of reason, *the antitrust laws protect competition, not particular competitors*." *Consolidated Metal Products,* 846 F.2d at 292-3 (citations omitted) (emphasis added). Demonstrating that the defendants harmed the plaintiff "is not enough to prove a violation of section 1 under the rule of reason. It is a natural part of a competitive market that products, firms, and – sometimes – entire sectors of the economy fail. A plaintiff does not have a claim under the rule of reason simply because others refuse to promote, approve, or buy its products." *Id*. at 293.

Under the rule of reason, "the plaintiff must establish two elements basic to an anticompetitive conspiracy: (1) that the defendant engaged in some form of joint action and (2) that this joint action amounted to an unreasonable restraint of trade." *Id*. at 293. Again, "every commercial agreement restrains trade. Whether this action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint." *Northwest Wholesale Stationers, Inc.,* 472 U.S. at 289. (emphasis in original).

"To survive summary judgment on the issue of conspiracy, the plaintiff must present

evidence that tends to exclude both the possibility of conduct consistent with permissible competition and the possibility that the alleged conspirators acted *independently*." *Consolidated Metal Products,* 846 F.2d at 294 (emphasis added). As stated above, "there must be evidence that tends to exclude the possibility of independent action by the [defendants]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co..*, 465 U.S.at 768. Furthermore, "[i]f the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Eastman Kodak*, 504 U.S. at 468-469.

It is readily apparent from the record that the plaintiff put most of its eggs in the basket assuming that the defendants' alleged behavior would be deemed a *per se* unreasonable horizontal boycott. Indeed, the vast bulk of the plaintiff's expert testimony involves the assumed profits that TWA would have made but for the casinos' refusal to do business with tunica.com and, thus, how much TWA's damages would be when trebled. In this case, it was more important that the plaintiff proffer expert testimony that tends to show that the defendants' behavior was an unreasonable restraint on trade, or was anticompetitive, in the relevant market (whether adverting as a whole of Tunica County as a travel destination or specifically internet advertising). The expert's testimony as to this is too sparse to create a genuine issue of material fact as to whether there was an unreasonable restraint on trade.

Assuming *arguendo* that the casinos (1) met together at the May 30, 2001 meeting of their trade association, (2) jointly discussed whether to pay TWA $2500 per month per casino to simply allow the internet address tunica.com to redirect one's internet browser to the Tourism Commission

website (assuming a person actually typed "tunica.com" into the browser address bar rather than using a search engine), and (3) and jointly decided to not use tunica.com, no reasonable juror could find that this is an unreasonable restraint on trade. This is especially true given that TWA, through Graziosi, made the proposal to all of the casinos with the clear understanding that she hoped all of them would agree to it – that is, she made a joint proposal that invited joint action. Even if she did not intend that all of them had to agree to the proposal or she would not have dealt with any of them, the clear understanding was that the proposal was joint in terms of being offered to all of them. Even if all of the plaintiff's proffered statements by or attributed to the defendants were true — although most of them are almost assuredly inadmissible hearsay – any agreement made in this context not to use tunica.com's first proposal by all of the casinos was not an unreasonable restraint of trade simply because any alleged joint refusal was in response to a joint proposal.

It is highly unlikely that the antitrust laws were designed to declare that the behavior alleged in this case is "trust" behavior. Here is presented a company that owned one product, a domain address, that it offered to a group of customers – *i.e.*, to all of the casinos in Tunica County, Mississippi. The company assumed that since the product was the internet address tunica.com in and of itself and without a website, the company would almost certainly be able to lease that product to all of the casinos for a high aggregate price. The casino customers considered the jointly-proposed product at one of their trade association meetings after being *called upon to discuss the proposal by the plaintiff*. They naturally discussed the joint proposal jointly and for many legitimate reasons, they all decided to decline use of tunica.com. Just because they all reached the same decision does not mean that one or more of the casinos forced or coerced all the others to decline to use tunica.com. Rather, in this case it is readily apparent that the casinos made their decision independently and since

they all decided not to use tunica.com, those independent decisions only appear to be concerted.

The casinos gave many reasons for not wanting to use tunica.com at that point. Among those reasons are: (1) the casinos already had their own websites; (2) the Tourism Commission already had a website featuring all of the casinos; (3) some or all did not like the fact that the plaintiff was a cybersquatter, that is, some did not like that the plaintiff was even allowed to own the internet address "tunica.com" which they believed should belong to Tunica County, Mississippi; (4) the proposed $2500 per month per casino just to link the address tunica.com to the Tourism Commission's website was far too expensive and not worth what the casinos would get in return; etc.

As to the plaintiff's post-May 30, 2001 individual proposals that individual casinos purchase advertising on the website TWA eventually operated at tunica.com, the record is devoid of adequate evidence establishing that the refusals by the casinos to deal constituted antitrust behavior given that the details of these proposals are lacking.

As cited above, to defeat summary judgment, the plaintiff must demonstrate genuine issues of material fact that the defendants did not reach their decisions independently and that the plaintiff's proposal made economic sense. The plaintiff has not done so. Simply put, contrary to the plaintiff's position, the casinos are not legally obligated to buy its product, which seems to be the assumption upon which the plaintiff's entire case rests.

### III. CONCLUSION

For the reasons discussed above, the court concludes that the Casino Defendants' Motion for Summary Judgment [299-1] should be granted because the plaintiff has not created a genuine issue of material fact necessitating a trial that the defendants' alleged behavior unreasonably

restrained trade in the relevant market. Accordingly, an Order shall issue forthwith,

**THIS DAY** of December 19, 2005.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE
