# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# DELTA DIVISION

**TUNICA WEB ADVERTISING, INC.**                                                             **PLAINTIFF**

**VS.**                                                                      **CAUSE NO.: 2:03CV234-SA-JAD**

**BARDEN MISSISSIPPI GAMING, LLC**
**(d/b/a "Fitzgerald's Casino and Hotel")**                                      **DEFENDANT**

## MEMORANDUM OPINION DENYING SUMMARY JUDGMENT

This matter comes before the Court on Barden Mississippi Gaming, LLC's (d/b/a "Fitzgerald's Casino and Hotel") ("Defendant") Motion for Summary Judgment filed on October 25, 2007. The Court finds that the Motion shall be **DENIED**. Specifically, the Court finds as follows:

### *BACKGROUND*

In November 1999, Cherry Graziosi purchased the domain names "tunicamiss.com" and "tunicamississippi.com" for approximately $140.00 from a domain name registrar. Subsequently, Plaintiff leased the names to Circus Circus Mississippi, Inc., (d/b/a Gold Strike Casino Resort) ("Gold Strike")[1]. Thus, if an internet user typed in "tunicamiss.com" or "tunicamississippi.com" in the internet browser bar, he would be automatically re-directed to "www.goldstrikemississippi.com". Gold Strike entered into a one-year lease at a rate of $2,000 per month, and when the lease expired, Gold Strike continued leasing it on a month-to-month basis for $5,000 a month.

In 2000, Graziosi formed Tunica Web Advertising, Inc. ("TWA") and purchased the domain name "tunica.com" for approximately $20,000. Thereafter, TWA leased "tunica.com" to

---

[1] Gold Strike was initially named as a defendant but subsequently was dismissed pursuant to settlement.

Gold Strike for ninety days at a price of $3,000 per month. Gold Strike continued to lease "tunica.com" for the next three months until April 30, 2001.

The Tunica County Tourism Commission ("TCTC") then filed suit against Graziosi claiming that she was a "cyber squatter" – one who purchases a domain name with the purpose of profiting from another entity's trademark. As part of the settlement of the lawsuit, Graziosi agreed to transfer to TCTC all of her rights to "tunicamiss.com" and "tunicamississippi.com." TCTC agreed to allow Graziosi to retain all rights to "tunica.com."

In May 2001, TWA appeared before the Tourism Commission and proposed that if the casinos[2] paid TWA $2500.00 per month per casino, anyone who typed in the internet address "tunica.com" would be redirected to the Tourism Commission's pre-existing website – featuring information on all eight casinos. Further, the casinos would have right of first refusal to purchase "tunica.com."

Karen Sock, a TCTC member and the general manager of the Grand Casino, referred the matter to the Tunica Casino Operators Association ("TCOA), a trade association created by the Tunica casinos. TWA's joint proposal was rejected by the casinos, and they voted not to utilize the "tunica.com" domain name. Clyde Callicott, then Marketing Director for Gold Strike, was in attendance at the meeting. According to the Plaintiff, following the meeting, Callicott contacted the Plaintiff and informed her that Dominic Mezzetta (the general manager of Fitzgerald's) told the casinos to refrain from doing any business on any terms with the Plaintiff, thus, creating a "gentleman's agreement" against TWA.

---

[2] Barden Mississippi Gaming, LLC (d/b/a "Fitzgerald's Casino and Hotel"); BL Development Corp. (d/b/a "Grand Casino Tunica"); Robinson Property Group, Ltd Partnership (d/b/a "Horseshoe Casino & Hotel") ; Tunica Partners II LP (d/b/a "Harrah's Tunica Mardis Gras Casino"); Bally's Olympia Limited Partnership (d/b/a "Bally's Saloon & Gambling Hall"); HWCC-Tunica, Inc. (d/b/a "Hollywood Casino Tunica"); Boyd Tunica, Inc. (d/b/a "Sam's Town Hotel & Gambling"); and Sheraton Tunica Corporation (d/b/a "Sheraton Casino & Hotel").

A week after the May 30, 2001, meeting, Grazioso emailed Callicott to determine the outcome of the meeting. Callicott emailed the following in response:

Cherry,

I was informed by my VP/GM (based on that discussion held at the TCOA meeting) to terminate the business relationship we have created with the "tunica.com" site. I wish I could do more but my hands have been officially tied by the TCOA on this issue.

I'm sorry,

Clyde

Furthermore, Grazioso also says that Callicott told her that Robert McQueen (general manager at Horseshoe Casino) said, "I am not interested in doing business with her. Let's all agree not to do business with her. And that way the site would be worthless." Weeks after the meeting, Graziosi states that she contacted Ellen Duffin, a marketing executive at Grand Casino, and advised her that Graziosi was aware of the "gentlemen's agreement" to which Duffin allegedly responded, "I guess the feeling is, if nobody does business with you, your site will be worthless."

After the May 30, 2001, meeting, TWA changed its business model by creating a website at "tunica.com" in hopes that it would generate revenue through casino advertising and/or commissions from online hotel bookings. TWA subsequently hired Memphis radio personality Rudi Schiffer to market "tunica.com" to the casinos. Additionally, TWA offered Clyde Callicott, who had left Gold Strike to become the marketing director at the Grand Casino, a portion of the profits for the sale of advertising on the "tunica.com." Callicott was a silent partner, and it is undisputed that the casinos had no knowledge of his involvement in the project. Schiffer approached a number of the casinos individually in attempt to market the website. All of the casinos declined to utilize the site.

However, Gold Strike entered into a contract with TWA in October 2001 wherein they granted the exclusive right to book bus tours to Gold Strike with specified terms on a commission basis to TWA. It is undisputed that TWA never sent Gold Strike a single bus tour referral.

Plaintiff states that the boycott was reaffirmed at a November 2002 TCOA meeting. On November 19, 2002, Callicott, then the marketing director for the Sheraton Casino and Bally's, emailed Graziosi and informed her that he understood that the TCOA had recently held a meeting at which the casinos voted to stay away from "tunica.com". Specifically, the email read,

> The meeting went well ... however it's [sic] looks like the Tunica casino (the TCOA) is turning their backs on Rudi thanks to a special meeting held last week backed by Dominic from Fitzgeralds. They apparently held a meeting last Tuesday to discuss this ... in a similar fashion as they did when you where [sic] involved. They voted to stray [sic] away from the site so it could evently [sic] be sold and bought at a later date by them. Dominic asked for a majority vote from each property to see if they would ban advertising on this site ... his arguement [sic] is that (although valuable) it is not for one individual to profit from. He beleaves [sic] that the state should own the site. With such a strong opponnent [sic], no property will cross that line individual [sic] to advertise with this project.

Rudi Schiffer emailed TWA on November 28, 2002, and reported:

> Cherry,
>
> have not made any headway with sales efforts .... seemed we missed the budget cycle by casinos and nobody wants to spend on another site and they seem to be pretty satisfied with their own websites. that ends my effort and sorry we couldn't get it together, I think it had great promise but I couldn't convince the folks who had the budgets to expand them for tunica.com

Graziosi and TWA filed this action on June 27, 2003, asserting state and federal antitrust claims against the casinos, the TCTC, and the TCOA. On November 24, 2004, this Court dismissed TCTC, holding that TCTC was immune from antitrust liability. Subsequently, the TCOA and Gold Strike were both dismissed from the suit. On December 19, 2005, this Court

granted summary judgment in favor of the remaining defendants on TWA's antitrust claims. Tunica Web Adver., Inc., v. Barden Miss. Gaming, LLC, 2005 WL 3488499 (N.D. Miss. Dec. 19, 2005). This Court also dismissed Cherry Graziosi individually for lack of standing. This Court held that: (1) the casinos' alleged conduct could not amount to a per se violation of section 1 of the Sherman Act; (2) any concerted refusal to deal with TWA arising from the May 30, 2001, TCOA meeting was not an unreasonable agreement in restraint of trade because it was a joint response to a joint proposal and because TWA did not produce sufficient evidence to show any anticompetitive effect; (3) TWA did not show that the casinos' post-May 30, 2001, refusals to deal with TWA and "tunica.com" were the result of concerted action, in part because TWA did not provide the details of any of its post-May 30, 2001, proposals to the casinos; and (4) antitrust laws were not created to protect TWA, who was merely a customer of the casinos and not a competitor.

On September 5, 2007, the Fifth Circuit Court of Appeals reversed the judgment of the district court and remanded the cause for further proceedings. Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc., 496 F.3d 403 (5th Cir. 2007). Specifically, the Court held (1) the casinos' initial decision to jointly reject the jointly submitted proposal was not an unreasonable agreement in restraint of trade; (2) Callicott's statements (allegedly later confirmed by Duffin) that the casinos had a "gentlemen's agreement" to not deal with TWA, if credited, created a genuine issue of material fact; (3) the casinos actions after the May 30, 2001, TCOA meeting, if credited, create a genuine issue of fact as to whether the casinos engaged in concerted action; (4) the district court erred in finding that the per se rule only applies in situations where one of the conspirators is a direct competitor of the victim; and (5) to determine whether the per se rule applies, the district court should have analyzed the following factors: (a) whether the casinos

hold a dominant position in the relevant market; (b) whether the casinos control access to an element necessary to enable TWA to compete; and (c) whether there exist plausible arguments concerning pro-competitive effects. Id. at 410-15; citing Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 290, 105 S. Ct. 2613, 86 L. Ed. 2d 202 (1985).

Subsequently, the casinos filed a Renewed Motion for Summary Judgment on October 25, 2007. On June 3, 2008, Plaintiff settled with all of the casinos except for Barden Mississippi Gaming, LLC (d/b/a "Fitzgerald's Casino and Hotel.") The October 25, 2007, Renewed Motion for Summary Judgment remains before this court.

*STANDARD FOR SUMMARY JUDGMENT*

To be entitled to summary judgment, a party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant has the initial burden of proving that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Rule 56(c) compels the court to grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S. Ct. 2548. Before finding that no genuine issue for trial exists, the court must first be satisfied that no reasonable trier of fact could find for the non-movant. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Section 1 of the Sherman Act, 15 U.S.C. § 1, states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." To state a claim under section 1 of the Sherman Act, a plaintiff must show the defendant "(1) engaged in a conspiracy (2) that restrained

6

trade (3) in a particular market." Spectators' Commc'n Network Inc. v. Colonial Country Club, 253 F.3d 215, 220 (5th Cir. 2001). A requisite of any section 1 conspiracy is a showing of concerted action on the part of the defendant. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984). "To establish concerted action, the plaintiff must present 'evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" Tunica Web Adver., 496 F.3d at 409. (quoting Monsanto Co., 465 U.S at 761, 104 S. Ct. 1464). Concerted action can be proven through direct or circumstantial evidence. Monsanto Co., 465 U.S. at 764, 104 S. Ct. 1464; Viazis v. Am. Ass'n of Orthodontists, 314 F.3d 758, 762 (5th Cir. 2002). "Direct evidence of concerted action 'is that which explicitly refer[s] to an understanding between the alleged conspirators,' while circumstantial evidence requires additional inferences in order to support a claim of conspiracy." Tunica Web Adver., 496 F.3d at 409; (citing Viazis, 314 F.3d at 762 (citations omitted)). "In sum, a plaintiff can survive summary judgment only if it 'show[s] that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could have harmed' the plaintiff." Tunica Web Adver., 496 F.3d at 409. (quoting Viazis 314 F.3d at 762). Furthermore, "[i]f the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." Eastman Kodak v. Image Technical Services, 504 U.S. 451, 468-69, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992).

*DISCUSSION*

TWA must bring forth sufficient evidence of a conspiracy or concerted action on the part of the casinos in order to overcome summary judgment. See AD/SAT v. Associated Press, 181

F.3d 216, 232 (2nd Cir. 1999) (an agreement must be established before the court can consider whether the agreement constituted an unreasonable restraint of trade).

Given the joint nature of the proposal, the casinos' decision to reject the joint proposal, the Fifth Circuit has held, was not concerted action subject to section 1. Tunica Web Adver., 496 F.3d at 410. Thus, the rejection of the $2500 per casino per month proposal was not an unreasonable restraint of trade.

The Fifth Circuit stated TWA created a genuine issue of material fact that although the casinos did not act unreasonably as to the joint proposal, during that same meeting, they may have acted in concert to prevent future business with TWA. Specifically, the Fifth Circuit stated:

> TWA's evidence – such as Callicott's statements and emails to Graziosi indicating the casinos had entered into a "gentlemen's agreement" to not deal with "tunica.com" and that Gold Strike had to terminate its relationship with "tunica.com" as a result of the casinos' agreement at the May 30, 2001 meeting is, if credited, direct evidence that the casinos agreed not only to reject TWA's initial proposal, but also to refuse to do business with TWA and "tunica.com" individually.

Id.
This Court opines, as implied by the Fifth Circuit, that TWA has created a genuine issue of material fact as to whether the casinos engaged in concerted action.

Specifically, in accordance with the Fifth Circuit, the Court is of the opinion that TWA's evidence of the casinos' actions after the May 30, 2001, TCOA meeting creates an issue of fact as to whether the casinos engaged in concerted action. See id.

The Fifth Circuit then examined whether TWA's argument that the casinos' refusal to do business with it amounts to a horizontal boycott that is per se unlawful under section 1. Id. at 411-12. The Fifth Circuit determined that it is not required that the victim of the boycott be a competitor of the boycotting parties. Id. at 413.

Finally, the Fifth Circuit held that this Court should have analyzed the following factors in determining whether the per se rule applies: (1) whether the casinos hold a dominant position in the relevant market; (2) whether the casinos control access to an element necessary to enable TWA to compete; and (3) whether there exist plausible arguments concerning pro-competitive effects. Id. at 410-15.

This Court holds that TWA has created a genuine issue of material fact that (1) the casinos hold a dominant position in the relevant market; (2) the casinos control access to an element necessary to enable TWA to compete; and (3) the practices were not justified by plausible arguments that were intended to enhance overall efficiency and make markets more competitive.

*CONCLUSION*

TWA has presented "evidence that tends to exclude both the possibility of conduct consistent with permissible competition and possibility that the alleged conspirators acted independently." Consol. Metal Prod. v. Am. Petroleum Inst., 846 F.2d 284, 290 (5th Cir. 1998). Moreover, Plaintiff's theory is not "economically senseless" and a reasonable juror could find in its favor. In sum, TWA has created fact issues; therefore, summary judgment is not warranted. Accordingly, the Defendant's Motion for Renewed Summary Judgment is **DENIED**.

A separate order shall issue on this day.

So **ORDERED**, this the 11th day of August, 2008.

                                              **/s/ Sharion Aycock**
                                              **U.S. DISTRICT COURT JUDGE**